## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **QUIRCH FOODS, LLC (f/k/a QUIRCH FOODS CO.); BUTTS FOODS, LP (f/k/a BUTTS FOODS, INC.); QUIRCH LOUISIANA LLC (f/k/a SCARIANO BROTHERS, LLC, a/k/a SCARIANO WHOLESALE FOOD DISTRIBUTION); and IQ FOODS OPCO, LLC (f/k/a INDEPENDENT QUALITY FOODS, LLC, a/k/a IQ FOODS),** | <u>**COMPLAINT FOR VIOLATION OF THE ANTITRUST LAWS**</u> |
|      **Plaintiff** | **Jury Trial Demanded** |
| **v.** | |
| **CARGILL, INC.; CARGILL MEAT SOLUTIONS CORPORATION (A/K/A CARGILL PROTEIN, A/K/A CARGILL PROTEIN - NORTH AMERICA); JBS S.A., JBS USA FOOD COMPANY; SWIFT BEEF COMPANY; JBS PACKERLAND, INC.; NATIONAL BEEF PACKING CO.; TYSON FOODS, INC; and TYSON FRESH MEATS, INC.,** | |
|      **Defendants** | |

Plaintiffs Quirch Foods, LLC. (f/k/a Quirch Foods Co.) ("Quirch Foods"),  Butts Foods, LP (f/k/a Butts Foods, Inc.) ("Butts Foods"), Quirch Louisiana LLC (f/k/a Scariano Brothers, LLC, a/k/a Scariano Wholesale Food Distribution) ("Quirch Louisiana"), and IQ Foods Opco, LLC (f/k/a Independent Quality Foods, LLC, a/k/a IQ Foods) ("IQ Foods") (collectively, "Plaintiffs") file this Complaint against Defendants Cargill, Inc. ("Cargill"), Cargill Meat Solutions Corporations (a/k/a Cargill Protein a/k/a Cargill Protein – North America) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), National Beef Packing Company ("National Beef"), Tyson Foods, Inc. ("Tyson Foods"), Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively, "Defendants"), including their unnamed co-conspirators, and alleges the following:

## **INTRODUCTION**

1.      Defendants are the world's largest beef processing and packing companies, also known in the industry as meatpackers or packers. In 2018, for example, Defendants sold approximately 80% of the more than 25 billion pounds of fresh and frozen beef sold in the U.S. market. During the relevant period, Defendants also collectively controlled approximately 81%–85% of the domestic cattle processed (a/k/a slaughtered) in the U.S. market. The next largest meatpacker had only a 2%–3% market share.

2.      Starting at least as early as January 1, 2015, Defendants exploited their market power in this highly concentrated market by conspiring to limit the supply of beef sold to purchasers in the U.S. wholesale market, including Plaintiffs, which resulted in higher prices paid by Plaintiffs. Plaintiffs' injuries have continued while the effects of the Defendants' conspiracy have continued, including at least through the end of 2021. For purposes of this Complaint, the term "beef" means boxed and cased-ready meat processed by Defendants and other smaller, nondefendant producers from

fed cattle, including primals, trim or sub-primal products, further-processed and value-added products, offal or variety products, rendered products and byproducts, and ground beef made from "cattle" (meaning "fed cattle," which are steers and heifers raised in feedlots on concentrated diets to be produced and sold as beef).

3.     The principal, but not exclusive, means Defendants used to effectuate their conspiracy was a scheme to artificially constrain the supply of beef entering the domestic supply chain. Defendants' collusive restriction of the beef supply had the intended effect of artificially inflating beef prices. As a result, Plaintiffs paid higher prices for beef than they otherwise would have paid in a competitive market.

4.     The United States (U.S.) Department of Justice ("DOJ") and the U.S. Department of Agriculture ("USDA") have launched investigations into whether Defendants fixed beef prices in the United States. In mid-2020, news sources reported that DOJ's Antitrust Division sent civil investigative demands to Defendants Tyson Foods, JBS SA, and Cargill, Inc., and to National Beef, Inc. (a company related to Defendant National Beef), seeking information about their pricing practices dating back to January 2015.

5.     Defendants' illegal activities have also invited Congressional scrutiny. In a June 2021 letter from 26 U.S. Senators to the DOJ, they described Defendants' actions as follows: "From our perspective, the anticompetitive practices occurring in the industry today are unambiguous and either our antitrust laws are not being enforced or they are not capable of addressing the apparent oligopoly that so plainly exists." The letter also noted that "[f]or far too long, cattle producers and consumers have been hurt by the increasing concentration of market power and anti-competitive actions of just a few meatpacking companies. Their collective power over the beef processing industry allows them to

seemingly control prices at their will." The Senators requested the DOJ and the USDA to investigate potential market manipulation and other illegal activity by Defendants.

6.      On information and belief, a witness who was previously employed by Defendant Swift at its Cactus, Texas slaughter plant, has confirmed the existence of an unlawful conspiracy by and among Defendants ("Witness 1").  This witness confirmed that all Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (*i.e.*, the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge Quirch Foods). Defendants' transactional data and slaughter volume records, information published by the USDA, and Defendants' public calls for industry-wide slaughter and capacity reductions corroborate Witness 1's account.

7.      In addition to the high concentration in the beef industry, other structural characteristics of the domestic beef market facilitated Defendants' conspiracy. Defendants play the central role in the supply and distribution chain that ultimately delivers beef to Plaintiffs: purchasing cattle from the nation's farmers and ranchers, slaughter, packing cattle into beef, and selling the beef to Plaintiffs and others. Defendants' pivotal role in the process enabled them to collusively control upstream and downstream beef pricing.

8.      Other market characteristics serve as plus factors supporting the inference of collusion by and among Defendants, including packer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire, market share stability, and decreased imports. These economic factors encouraged and solidified the formation of Defendants' conspiracy and fostered its successful operation.

9.      Defendants capitalized on the fundamental mechanisms of supply and demand operating in a beef market vulnerable to successful cartel formation and operation, and illegally collaborated to restrain and manage production of beef in the United States.

10.     These practices intentionally led to shortages in the beef market. These artificial conditions, in turn, boosted the prices Defendants charged, and which Plaintiffs had no choice but to pay, for beef. The results intended and achieved by Defendants were higher profit margins (*e.g.*, meat margins) than would have otherwise existed in a competitive market, and injury and damage to Plaintiffs' businesses and property.

11.     The growth of Defendants' profit margins was aided by the way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long lifecycle of livestock, livestock's perishable nature, and the lack of any alternative use for livestock. Beef demand is also relatively insensitive to price fluctuations. As a result, Defendants' profit margins were (and are) very responsive to changes in the aggregate volume of slaughtered cattle.

12.     Another form of interaction conducive to Defendants' collusion was frequent meetings between each other's executives and key employees. Trade association conferences and other industry events offered convenient opportunities to exchange information, plans, and strategies, and to build relationships. As described throughout this Complaint, Defendants used these opportunities to advance their collusive supply restrictions.

13.     By the beginning of 2015, Defendants were exploiting favorable market conditions to launch their conspiracy. Beginning no later than that time, they undertook a campaign of reducing and restraining the processed beef supply. Publicly-available industry data demonstrate Defendants' abrupt transition from competition to collusively managing their respective slaughter volumes.

14.     Each Defendant family curtailed its annual slaughter volumes during the relevant period as a result of their agreement to this common conspiracy.

15.     As an immediate consequence of Defendants' conspiracy to reduce supply, the beef market experienced a dramatic change in price behavior. Before 2015, prices of cattle and beef predictably moved in tandem, which was their natural economic relationship in a competitive market because beef is processed cattle.

16.     But when Defendants began collusively cutting production, this fundamental economic relationship between cattle and beef prices abruptly changed, because supply and pricing were no longer set at competitive levels. The degree of correlation of cattle and beef prices diverged (to Defendants' benefit) without any credible, non-collusive explanation. The relevant supply and demand factors in the industry no longer explained the prices charged to beef purchasers, including Plaintiffs.

17.     Starting in 2015, wholesale beef prices began to show unusual trends. The per-pound price of cattle had historically stayed within 20 to 40 cents of the per-pound average wholesale price of beef. But in 2015, the spread between those prices increased dramatically.

18.     The figure below contains indices of the prices paid for cattle, both Texas/Oklahoma steers (35%-65% choice) and Nebraska steers (65%-80% choice), as well as retail beef prices in the United States. As shown, these price indices moved together from 2012 to 2014. However, beginning around early 2015, cattle prices began falling dramatically while retail beef prices remained relatively stable. The disparity between these prices represents a significant departure from historical trends, is at odds with competitive behavior, and suggests anticompetitive conduct was the driving force of these price disparities.



19.     According to USDA Economic Research Service data, the average spread between the average farm price of cattle and wholesale price of beef was substantially higher during the alleged conspiracy than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase.

20.     Defendants' ability to cut beef production while maintaining inflated beef prices provides compelling circumstantial evidence of their conspiracy. In a competitive beef market free from collusion, if a competitor reduced its purchase of cattle, other competitors would quickly increase their purchases to boost their sales and increase their market shares.

21.     In such an environment, therefore, a competitor would not unilaterally cut its purchases and suffer lost sales.  Only colluding meatpackers could expect to benefit by reducing their purchases and slaughter of cattle, because as a result of their conspiracy, they knew that their nominal competitors would not increase their purchasing volumes as would be expected in a competitive market. By

concertedly slashing their supply output, Defendants consistently expanded their profit margins, confident that none of them would grab volume from another Defendant.

22.     United by their conspiracy, Defendants were confident that none of them would break ranks and disproportionately expand their beef production to satisfy unmet demand. Armed with this assurance, Defendants improved their beef margins by achieving and sustaining an unprecedented gap between cattle and beef prices.

23.     Buttressed in part by their collective market power in their purchases in the upstream (cattle) and sales in the downstream (beef) markets, Defendants' conspiracy allowed them to steadily enlarge their operating margins, including as reported publicly. By the end of 2020, the two largest Defendants, Tyson Foods and JBS USA, reported record margins in their beef business. Tyson Foods reported that its beef business' operating margin was nearly 10.7%—nearly triple its 2014 operating margin. JBS USA reported a higher beef business margin of 11.5% for the first three quarters of 2020.

24.     In summary, Defendants colluded to reduce beef supplies, thereby unlawfully raising and fixing beef prices at levels higher than prices would have been had the beef market been competitive. As a direct and proximate result of Defendants' wrongful actions, Plaintiffs suffered antitrust injury and damages by paying illegally-inflated prices for beef that they purchased from Defendants.

25.     Defendants and their co-conspirators' conspiracy is a violation of Section One of the Sherman Act, 15 U.S.C. § 1 (Count I), and the Packers and Stockyards Act (Count II).

## JURISDICTION AND VENUE

26.     Plaintiffs bring this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 209, for the injuries sustained by Plaintiffs as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 202 of the PSA, 7 U.S.C. § 192.

27.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, and Section 308 of the PSA, 7 U.S.C. § 209.

28.     This Court has personal jurisdiction over each Defendant because each Defendant, throughout the United States, including in this District and the State of Illinois, transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the above-described illegal scheme and conspiracy (and continues to do so). The alleged scheme and conspiracy were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, and/or doing business throughout the United States, including this District and the State of Illinois.

29.     Defendants' and co-conspirators' above-described wrongful actions were within the intended flow of commerce within the United States and had direct, substantial, and reasonably foreseeable effects on interstate commerce.

30.     Venue is proper in the Northern District of Illinois under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §§ 1391(b); (c); and (d), and Section 308 of the PSA, 7 U.S.C. § 209. because during the relevant period, one or more Defendants resided, transacted business, were found, or had agents in this District (and continue to do so), and a substantial portion of Defendants' alleged wrongful actions affecting interstate trade and commerce was carried out in this District.

31.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because (i) each Defendant transacts and/or transacted business in Illinois, (ii) the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and (iii) each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

## PARTIES

**I.    Plaintiffs.**

32.    Plaintiff Quirch Foods is a Florida limited liability company with its principal place of business in Coral Gables, Florida.  At all relevant times, Quirch Foods, directly purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of the Defendants' above described wrongful actions.

33.    Plaintiff Butts Foods is a Tennessee limited partnership with its principal place of business in Jackson, Tennessee.  At all relevant times, Butts Foods, directly purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of the Defendants' above described wrongful actions.

34.    Plaintiff Quirch Louisiana is a Delaware limited liability company with its principal place of business in Hammond, Louisiana.  At all relevant times, Quirch Louisiana, directly purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of the Defendants' above described wrongful actions.

35.    Plaintiff IQ Foods is a Florida limited liability company with its principal place of business in Lakeland, Florida.  At all relevant times, IQ Foods, directly purchased beef at artificially inflated prices directly from one or more of the Defendants and/or their affiliates or agents, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of the Defendants' above described wrongful actions.

## II.     Defendants and their Subsidiaries and Affiliates.

36.     The term "Defendants" includes Defendants and all their predecessors, successors, and assigns, including beef meatpackers merged with or acquired by any Defendant and each Defendant's current or former wholly owned or controlled subsidiaries or affiliates that sold beef in interstate commerce directly to purchasers in the United States, including this District, from January 1, 2015, through whenever the effects of the Defendants' conspiracy end, including through at least the end of 2021.

37.     Each Defendant sold or distributed beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All Defendants were active, knowing participants in the alleged conspiracy, and their conduct, to the extent committed by Defendants, was known to, and approved by, their co-Defendant parent companies.

### A.     The Cargill Defendants.

38.     Defendant Cargill, Inc., is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the relevant period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, and/or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to their businesses or property. Cargill, Inc. is the parent company of the Cargill Defendants.

39.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("CMS") is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. CMS is the principal operating entity within Cargill, Inc.'s U.S. cattle and beef business, and is a wholly owned subsidiary of Cargill, Inc. On information and belief, CMS owns directly, or indirectly through its subsidiaries, Cargill, Inc.'s U.S. fed cattle slaughter plants, and contracts for the purchase

of cattle slaughtered there. CMS engaged in the above-described wrongful actions that directly and/or proximately caused Quirch Foods to suffer injury, harm, and damages to its businesses or property.

40. Throughout the relevant period, Defendant Cargill, Inc. wholly owned, as a direct or indirect subsidiary, Defendant CMS, and sold, along with CMS, beef in interstate commerce, directly or through its wholly owned or controlled affiliate, to purchasers in the United States, including this District.

41. During the relevant period, Defendants Cargill, Inc. and CMS shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the above-described conspiracy that purposefully directed conduct causing injury, harm, and damages to Plaintiffs in the United States.

42. By controlling, dictating, or encouraging their culpable subsidiaries' and/or affiliates' anticompetitive conduct to advance a common scheme for an illegal and anticompetitive purpose, Cargill, Inc., as the parent entity of the Cargill Defendants, independently entered and participated in the illegal enterprise with its culpable subsidiaries and/or affiliates.

43. Rather than owning and operating subsidiaries to diversify risk and earn profits by investing in them, Cargill, Inc. formed subsidiaries to conduct business that it otherwise would have conducted itself. To this end, Cargill, Inc. created CMS to conduct its business in the meat industry that Cargill, Inc. previously operated itself.

44. There is one unified system that processes both companies' purchase orders, which further demonstrates the relationship between Cargill, Inc. and CMS. Cargill, Inc. also operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

45.     Cargill, Inc. plays an active role in managing CMS's business operations. As one example, Cargill, Inc.'s website reported that its chairman and CEO, David MacLennan, "supervised several businesses in Cargill Protein," which subsumes CMS.

46.     As another example, Cargill, Inc. describes the responsibilities of executive team member, Brian Sikes, as including "leading Cargill's global protein and salt businesses," overseeing "Cargill's protein business in North America and Europe," and leading "the transformation of the North American protein business." Mr. Sikes lives in Wichita, Kansas, the location of CMS' principal place of business.

47.     Finally, Cargill, Inc.'s slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as DBAs with the USDA Food Safety Inspection Service.

48.     Cargill, Inc. created CMS as its instrumentality to execute Cargill, Inc.'s directives. Cargill, Inc. exerted, and had the right to exert, control over CMS. In this manner, Cargill, Inc. independently participated in the illegal enterprise along with CMS.

**B.      The JBS Defendants.**

49.     Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the relevant period, JBS S.A. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property. JBS S.A. is the parent company of the JBS Defendants.

50. JBS S.A. is also the primary owner of Pilgrim's Pride Corporation, one of the world's largest poultry producers, which recently plead guilty to price-fixing charges in the broiler chicken industry, paying a $107 million criminal fine for its role in a long-running cartel targeting direct purchasers of broiler chicken in the United States.

51. Defendant JBS USA Food Company ("JBS USA") is one of the world's largest beef and pork processing companies. JBS USA is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity within Defendant JBS S.A.'s U.S. cattle and beef business, the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States, and engaged in the above-described wrongful actions that directly and/or proximately caused direct purchasers to suffer injury, harm, and damages to its businesses or property.

52. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of Defendant JBS S.A.'s U.S. fed cattle slaughter plants, including the plants in Cactus, Texas, Greeley, Colorado, Grand Island, Nebraska, and Hyrum, Utah. Swift contracts for most of the fed cattle to be slaughtered at these plants. Swift engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

53. Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s U.S. fed cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania.

13

Packerland contracts for most of the fed cattle to be slaughtered at these plants. Packerland engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

54.     On information and belief, various senior staff members and executives responsible for the operation of the JBS Defendants' U.S. fed cattle and beef business during the relevant period were employed by each of JBS USA Food Company Holdings, JBS USA Food Company, Swift, and Packerland.

55.     During the relevant period, JBS S.A. wholly owned as direct or indirect subsidiaries, JBS USA, Swift, and Packerland, sold, along with JBS USA, Swift, and Packerland, beef in interstate commerce, directly or through these wholly owned or controlled affiliates, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

56.     During the relevant period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the above-described conspiracy that purposefully directed conduct causing injury, harm, and damages to Plaintiffs in the United States.

57.     By controlling, dictating, or encouraging their culpable subsidiaries' and/or affiliates' anticompetitive conduct to advance a common scheme for an illegal and anticompetitive purpose, JBS S.A. as the parent entity of the JBS Defendants, independently entered and participated in the illegal enterprise with its culpable subsidiaries and/or affiliates.

58.     JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries. JBS S.A. established subsidiaries, including JBS USA, Swift, and Packerland, to conduct its business, including the purchase and processing of cattle and the sale of

beef. Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

59.      JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, which it refers to as "JBS beef," as a "division" or "business unit." JBS S.A. commonly refers to JBS USA as its "JBS USA beef business[.]" As reported on JBS USA's financial statements, JBS USA "conducts its United States beef and pork processing businesses through its wholly-owned subsidiaries Swift Beef Company ('Swift Beef'), Swift Pork Company ('Swift Pork') and JBS Packerland, Inc."

60.      JBS S.A. appointed JBS USA's CEO Andre Nogueira. He "report[s] directly" to JBS Global Operations' CEO. In Mr. Nogueira's online "Welcome" message, he explains that JBS USA operates "[i]n partnership with JBS S.A."

61.      Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They are under the complete control of JBS USA, and in turn, JBS S.A. JBS USA directs and oversees all JBS's U.S. cattle procurement, beef processing, and sales operations, with ultimate direction from JBS S.A. JBS USA's financial statements are replete with references to notes, loans, and credit facilities that "are guaranteed by our Parent, JBS S.A."

62.      Swift and JBS Packerland's packing operations are presented as those of JBS USA. For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively. The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company" amongst other DBAs for Swift.

63.     JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives. JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. JBS S.A. does more than just provide long-term strategy and guidance to JBS USA, Swift, and Packerland. The entire purpose of these subsidiaries is to serve as instrumentalities by executing JBS S.A.'s directives within the greater JBS enterprise. JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland. In this manner, JBS S.A. independently participated in the illegal enterprise along with JBS USA, Swift, and Packerland.

## C.    National Beef Packing Company.

64.     Defendant National Beef Packing Company ("National Beef") is a privately owned Delaware limited liability company with its principal place of business at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

65.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered at such locations.

## D.    The Tyson Defendants.

66.     Defendant Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered at 2200 Don Tyson Parkway, Springdale, Arkansas 72762**.** During the relevant period, Tyson Foods,

Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

67.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

68.     On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered in such location.

69.     Tyson Foods wholly owned, as a direct or indirect subsidiary, Tyson Fresh, and sold, along with Tyson Fresh, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States, including this District, and engaged in the above-described wrongful actions that directly and/or proximately caused Plaintiffs to suffer injury, harm, and damages to its businesses or property.

70.     On June 10, 2020, Tyson Foods announced it was fully cooperating with DOJ's price-fixing investigation into the broiler chicken industry under the antitrust division's Corporate Leniency Program.

71.     The Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the above-described conspiracy that purposefully directed conduct causing injury, harm, and damages to, and derived direct benefit from, Plaintiffs in the United States.

72.     By controlling, dictating, or encouraging their culpable subsidiaries' and/or affiliates' anticompetitive conduct to advance a common scheme for an illegal and anticompetitive purpose, Tyson Foods as the parent entity of the Tyson defendants, independently entered and participated in the illegal enterprise with its culpable subsidiaries and/or affiliates.

73.     Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries. Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would have otherwise conducted. With respect to Tyson Foods' subsidiary Tyson Fresh, such activities include purchasing and processing cattle and selling beef.

74.     Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit."

75.     On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance. On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson Fresh operates. More specifically, on these calls Tyson Foods attributes improved returns to actions taken at plants that Tyson Fresh owns and operates.

76.     On earning calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy. For example, on its August 3, 2015 earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin and not for market

share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

77.     Similarly, on Tyson Foods' May 7, 2018 earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "we have to stop production, we have closed plants, several times in the quarter, not every plant, but several plants in the quarter."

78.     Tyson Foods and Tyson Fresh also guarantee each other's debts. Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the SEC in 2009, Tyson Foods notified investors that Tyson Fresh pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

79.     Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor to Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple senior notes under this arrangement.

80.     Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, and Amarillo, Texas, identify Tyson Foods as a business name of Tyson Fresh.

81.     Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose and common objectives. Tyson Foods' extensive involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh. Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson enterprise and to serve as an instrumentality

of Tyson Foods. Tyson Foods exerted, and had the right to exert, control over Tyson Fresh. In this manner, Tyson Foods independently participated in the illegal enterprise along with Tyson Fresh.

### E.    Co-Conspirators.

82.    Unknown persons, firms, corporations, and/or other entities not named as Defendants in this complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co- conspirators, regardless of whether Quirch Foods formally name such co-conspirators as Defendants.

### F.    Reciprocal Agency of Defendants and Co-Conspirators.

83.    Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, and/or representatives while actively engaged in the management, direction, control, and/or transaction of the entity's business and/or affairs.

84.    Each Defendant and co-conspirator acted as the agent or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiffs allege.

### <u>INDUSTRY BACKGROUND</u>

85.    The United States is the largest producer of beef in the world, primarily "high quality, grain-fed beef for domestic and export use."[1] The United States also has the "world's largest fed-cattle industry because most of its cattle are grain fed." *Id.*

86.    The market for fed cattle in the United States is substantial. In 2017 alone, for example, 25.8 million fed cattle were slaughtered and processed into beef products—which accounted for 80%

---

[1]    *See* the "Cattle & Beef" section of the USDA website (hereafter "USDA Cattle & Beef"), available at https://www.ers.usda.gov/topics/animal-products/cattle-beef/; "IBISWorld Industry Report 11211 – Beef Cattle Production in the US," IBISWorld, December 2018 (hereafter "IBIS Cattle Production Report") at 15.

of the 32.2 million commercial cattle slaughtered across the U.S. (the remaining volume is composed of slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products, such as hamburger patties).

87. The size of cattle herds in the United States is influenced by what is known as the "cattle cycle," which refers to "cyclical increases and decreases in the cattle herd over time that arise because biological constraints prevent producers from instantly responding to price." The cattle cycle is typically determined by the "combined effects of cattle prices; the time needed to breed, birth, and raise cattle to market weight; and climactic conditions." For example, cattle farmers will slowly increase or reduce their herds if cattle prices are expected to be high or low, respectively. While cattle cycles typically last for eight to twelve years (the longest among meat animals), "the effects of persistent dry conditions on pastures and harvested forage supplies can shorten or extend cycles."

88. Production of cattle raised for beef takes considerable time and investment. The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat. Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots. Calves are first raised by their mothers for six to ten months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector where they eat a diet of forage, wheat pasture, and silage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage.

89. Once cattle reach 950–1,300 pounds, they are sold as fed cattle to beef processors. Beef producers like Defendants then slaughter and process the cattle into edible boxed beef and smaller case-ready consumer cuts. A steer weighing 1,000 pounds typically yields about 450 pounds of edible beef.

90.     Cattle are sold to beef processors through two channels. About 70 percent of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices under the captive-cattle agreements. Because Defendants ordinarily have a steady supply of cattle through captive-cattle agreements, they are not forced to buy in the spot market. This affords Defendants the power to suppress the price of cattle purchased in the spot market, which, in turn, depresses the prices of captive-cattle agreements.

91.     In the final stage of the farm to market journey, Defendants and other meatpackers and distributors sell the beef to businesses, including Plaintiffs and other wholesalers, retailers, food service companies, grocery chains, restaurants, and institutions.

92.     As the cost of fed cattle constitutes the majority of their cost of production, Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Defendants, through illegal cooperation, have increased it. When the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded, and customers pay more for beef because less is available for purchase. Because the supply of fed cattle and demand for beef are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits

93.     As a result of these sensitivities, Defendants can (and did) improve their profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle, creating a supply surplus in the upstream fed cattle market and a supply shortage in the downstream beef market.

## DEFENDANTS' ANTITRUST AND PSA VIOLATIONS

94.     Before the beginning of their conspiracy, Defendants were experiencing shrinking profit margins on their beef sales.

95.     For example, on a November 7, 2014, earnings call, Tyson Foods reported a quarterly operating margin that was less than half the margin enjoyed by its poultry division. Similarly, on a November 13, 2014, earnings call, JBS S.A. announced its beef segment was badly underperforming; it's quarterly margin was only about a third of its pork segment margin.

96.     But rather than act independently and competitively in their individual business interests to attempt to restore profitability, Defendants instead agreed to collectively reduce and manage their respective slaughter volumes, reducing the supply of beef made available to the downstream market, including to Plaintiffs. The resulting beef shortage ushered in a new era of supra-competitive prices paid by Plaintiffs and other direct purchasers, even as Defendants' conspiracy decreased the prices they paid for fed cattle.

## I.     Direct Evidence of Defendants' Conspiracy to Manage Slaughter Volumes.

97.     A former employee of Defendant Swift, knowns as "Witness 1," confirmed the existence of the alleged conspiracy to manage slaughter volumes.

98.     Based on conversations with James Hooker, head of fabrication at Swift's Cactus, Texas plant, Witness 1 stated that each Defendant expressly agreed to periodically reduce their respective purchase and slaughter volumes, resulting in wholesale beef prices above competitive levels, including the artificially-inflated beef prices paid by Plaintiffs.

99.     During his decade-long employment, including several years coinciding with the alleged consapiracy, Witness 1 was a head quality assurance officer with primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*,

head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down before being stored in the coolers prior to fabrication where they are broken down into smaller cuts.

100.    Witness 1 learned of Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker. Mr. Hooker was the head of fabrication at Swift's Cactus, Texas plant and, as explained below, was in a position to know (and did know) about Defendants' unlawful agreement.

101.    Witness 1 regularly spoke with Mr. Hooker before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days. These numbers affected how Witness 1 and his team would execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would process through the hotbox and coolers that day, and interactions with USDA inspectors.

102.    In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the price of beef remained favorable by the standards of the conspiracy, the fabrication floor would continue to process carcasses at typical rates. However, when the price of beef was unfavorable and pursuant to the conspiracy planned kill volumes were reduced, Mr. Hooker could order the carcasses to spend longer in the hot boxes and coolers before being fabricated into beef cuts. In this circumstance, Witness 1 and his team would allow more space between each carcass in the hotboxes.

103.    But if the terms of the conspiracy allowed for the planned kill volume to move higher, Mr. Hooker increased the number of carcasses fabricated. To ensure there was sufficient space in the hotboxes and coolers, Witness 1 spaced the carcasses closer together when filling the hotboxes. The number of carcasses expected to be put into the hotboxes also dictated the amount of air and water Witness 1 and his team used to ensure proper cooling speeds.

104. In sum, it was essential for both Mr. Hooker and Witness 1 to know the plant's planned slaughter figures to coordinate and perform their core job duties. Witness 1 reported having had a decent working relationship with Mr. Hooker.

## II. Mr. Hooker was Well Positioned to Know About Defendants' Unlawful Agreement.

105. On information and belief, Mr. Hooker continues to work at Swift's Cactus, Texas plant, where he has worked for over fifteen years, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant where he was also responsible for beef fabrication.

106. As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero, and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado. Mr. Guerrero worked for CMS for approximately seventeen years prior to his move to JBS's Cactus, Texas plant. He was Plant Manager for CMS's Fresno, California, plant prior to his departure in early 2012 for JBS.

107. As head of fabrication, Mr. Hooker had to be informed regarding cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. In doing so, he interacted with personnel across JBS USA/Swift/Packerland. In addition to his direct reports, Mr. Hooker also spoke directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes and fabrication priorities.

108. For example, during the alleged conspiracy, Mr. Hooker regularly spoke directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Plant Operations for JBS's fed cattle business when Mr. Nogueira visited the Cactus, Texas plant. Witness 1 understands that Mr. Hooker also spoke to Mr. Nogueira at other times. Mr. Hooker's contact with senior

management confirms that JBS USA/Swift/Packerland senior executives maintained direct connections with plant-level managers, like Mr. Hooker, during the alleged conspiracy.

109. Mr. Nogueira was installed by Wesley Batista, JBS S.A.'s CEO, and considered Mr. Batista's "right hand man" regarding JBS's U.S. beef operations. Mr. Nogueria had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the relevant period.

110. Wesley Batista, on the other hand, is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother, Joesley Batista, took control of JBS S.A. in the early 2000s, prior to JBS' acquisition of Swift and Pilgrim's Pride. Wesley Batista is the former JBS S.A. CEO who directed JBS' takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift, and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil. He was ousted as CEO and spent time in prison.

111. Mr. Hooker also was responsible for the Cactus, Texas plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations. When acting as the Cactus, Texas plant General Manager, Mr. Hooker worked closely with fed beef executives from across JBS's head office. As such, Mr. Hooker regularly spoke to, and had a close working relationship with, highly placed executives at JBS.

112. In addition to having general corporate information about JBS, Mr. Hooker had information regarding the other Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo, Texas plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues at other Defendants' plants with whom he stayed in touch. Mr. Hooker often provided Witness 1 with detailed information regarding the current and future operations of Tyson Fresh, CMS, and National Beef's nearby packing plants.

### III.  Witness 1 Learns of Defendants' Unlawful Agreement.

113.   Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that Defendants reduced their purchase and slaughter volume to reduce fed cattle prices when Defendants viewed fed cattle prices as being or becoming "too high" for their liking. During one such conversation in 2015, Mr. Hooker specifically admitted that Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

114.   In fact, Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor who worked in JBS USA/Swift/Packerland's central office in Greeley, Colorado. After the call concluded, Witness 1 reports that he asked Mr. Hooker how many they were cutting. Witness 1 reports that Mr. Hooker replied the cut was going to be steady that day, but that the kills were getting cut back, because the price was getting too high.

115.   Witness 1 further reports that there was typically a lag between commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this phenomenon reflected the fact that a slaughter plant's fabrication team had to continue processing the carcasses already hanging in the coolers.

116.   Witness 1 also recalls asking Mr. Hooker whether the competitor plants of the Swift Cactus, Texas plant were also cutting back their kill. Witness 1 reports that Mr. Hooker answered Witness 1's question yes, that they had an agreement that they don't kill while prices are up.

117.   Witness 1 is certain that Mr. Hooker intended to convey the fact that all Defendants were reducing their slaughter volumes by agreement , and not simply commenting that one or some of the Defendants had independently decided to do so.

118.   Witness 1 stated that Swift's Cactus, Texas plant had a 5,500–6,000 head per day slaughtering capacity and might drop its kill level to around 4,800–5,200 head per day when

implementing Defendants' unlawful agreement. When Swift bought and slaughtered fewer cattle, the consequences included running its slaughter plants at reduced hours, operating the plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

119.    Witness 1 recalls management at Swift's Cactus, Texas plant, including Messrs. Guerrero and Wagnon, pretextually telling staff during such periods of reduced slaughter during the alleged conspiracy that kill levels were being reduced in response to fed cattle prices. Meanwhile, as further described below, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting supply.

## IV. The Available Data Corroborates Witness 1's Account.

120.    Public reports and data further confirm that Defendants reduced and rationed their slaughter volumes during the relevant period, resulting in supra-competitive beef prices. Defendants also managed their respective slaughter volumes throughout the relevant period in relative lockstep to ensure the beef supply remained lower than the corresponding increasing beef demand. Defendants did so despite cattle being readily available and their margins increasing substantially.

121.    In a competitive market, the slaughter reductions would have been against Defendants' unilateral economic self interest. Defendants collectively moderated their slaughter volume during the second and third quarters of most years in a successful effort to expand their margins across several months, thereby also forestalling both the onset, and minimizing the effect of, the increase in slaughter volume that historically occurs annually in the autumn.

122.    Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts." *See* Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, 2018 NIAA Antibiotic Symposium: New

Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3 WBcqzo.

123.    Nor did any Defendant break from the agreement and buy more cattle to capture greater market share, despite all of them posting profit margins clearly demonstrating that their marginal cost of production was well below their marginal revenue. From the end of the first quarter of 2015 through at least the end of 2021, Defendants posted record per head net margins, and Defendants' average per head margins for the first, second, third and fourth quarters annually greatly exceeded their pre-conspiracy averages.

124.    Tyson Fresh, Swift/Packerland, and National Beef dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These Defendants' artificially-low slaughter volumes worked to cause the dramatic decline in fed cattle prices starting in 2015, while prices for the beef they sold stabilized or increased.

125.    And while the quarterly reporting period obscures certain shorter reductions described below, it confirms the remarkable extent to which Defendants' quarter-to-quarter slaughter changes moved in lockstep with each other. This parallelism is consistent with, and the product of, an agreement to jointly manage and reduce slaughter levels below a competitive level.

126.    This uniform reduction during periods of seasonally lower cattle availability was not evident prior to the alleged conspiracy. Instead, as expected in a competitive market, different competitors made different strategic decisions.

127.    For example, in the fourth quarter of 2012, both CMS and Swift/Packerland significantly increased their slaughter volumes (3.7% and 12.0%, respectively on a quarter-on-quarter basis), while Tyson's held its steady (0.1% increase), and National Beef engaged in notable cuts (-4.0% decline). Similarly, in Q3 2013, Tyson Fresh and National Beef increased their slaughter

volumes, while Swift/Packerland and CMS reduced theirs. Across Q2 to Q4 2014, Swift/Packerland evidently sought to capture market share, first substantively increasing its slaughter volume in second quarter (16% increase against other Defendants increases of between 4.5%-10%) before holding it steady across the third and fourth quarters while each of the other Defendants' volumes declined in those two quarters.

128.    But as a result of the Defendants' conspiracy, they started collusively implementing deep cuts in 2015 and 2016, when comparing the same quarter to recent pre-conspiracy production (2012-2014). In 2015, the production decreased in the year overall and each quarter. For 2016, the production decreased overall and for three of four quarters. Tyson Fresh's, Swift/Packerland, CMS,' and National Beef's production was down comparing year-on-year changes against an average of 2012-2014.

129.    Defendants' strategy was immediately successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cash cattle prices falling. Defendants' meat margins expanded rapidly as a result.

130.    Moreover, Defendants' conduct stands apart from independent packers who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

131.    As a result of their conspiracy, and despite their gradiual increases during the conspiracy, Defendants continued to slaughter fewer cattle than they did before their conspiracy began. And though Defendants gradually increased their slaughter volumes year-on-year during the relevant period, their rates of increase lagged far behind other producers' rates. *See Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports*, 2008-2019, http://www. cattlebuyersweekly.com/users/rankings/index.php; *2018 Meat & Poultry Facts,* 47th Ed., NORTH AMERICAN MEAT INSTITUTE (2019) at 11. (National Beef acquired Iowa Premium in June 2019,

adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition, its 2019 slaughter volume was flat compared with 2018. At the same time, independent packers' collective slaughter volume rose by approximately 100,000 head (net of the Iowa Premium acquisition)).

132.    Each Defendant also slaughtered significantly less cattle in 2015 than before their conspiracy began, and then each maintained artificially low slaughter levels. That Defendants only slowly raised their slaughter levels as the availability of fed cattle increased, maintaining levels below their pre-conspiracy level, whereas independent packers increased their slaughter levels well above their prior levels, further confirms the Defendants operated under an ongoing collective agreement to manage slaughter levels after their initial cut. Fully five years later, none of the Defendants had returned to their pre-2015 slaughter levels despite record profitability, while independent packers' slaughter had increased nearly 50% against the pre-conspiracy average, and 25% against their 2015 levels. The result of such collusive actions gave Defendants the ability to manage collective fed cattle demand such that it never outpaced supply, ensuring the supply of beef stayed below demand.

## V.    Defendants Slash Production in 2015.

133.    As evidenced by publicly available data, the impact of the conspiracy in 2015 was sudden and dramatic. Each Defendant cut its annual cattle slaughter volumes during this period by an average of about 11.3% compared to the recent pre-conspiracy period (2007-2014). In sharp contrast, other meatpackers increased their cumulative annual slaughter volumes during the same period by an average of 41.2%.

134.    Data breaking out slaughter volumes by year highlight Defendants' extreme reductions in 2015, though other beef producers maintained or increased their volumes that year. For example, despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume decreased by 4% as compared with 2014 , Swift/Packerland by 17%, and National Beef by 6%. CMS's 2015 production was flat compared with the prior year but 11.3% below its recent pre-conspiracy

31

averages. All this occurred during a sustained recovery in the broader economy as the U.S. population grew steadily and beef demand increased.

135.    In the first quarter of 2015, Tyson Fresh's, Swift/Packerland's, and National Beef's year-on-year slaughter was down by 1.8%, 11.2%, and 8.6%, respectively. CMS's quarterly slaughter volume was down against a 2012-2014 average, and its first quarter 2015 slaughter volume, like that of its co-conspirators, decreased compared to its fourth quarter 2014 volume.

136.    These declines were reflected in Defendants' public reporting. Tyson's May 4, 2015 Report on Form 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015, year-on-year] due to a reduction in live cattle processed." Jefferies Financial Group, Inc. ("Jefferies"), National Beef's then majority shareholder, noted in its May 8, 2015 Report on Form 10-Q that National Beef's revenues decreased year-on-year for the first quarter "primarily to lower sales volume, as fewer cattle were processed." *See* Jefferies 10-Q (May 8, 2015) at 57, http://ir.jefferies.com/reports-filings/sec-filings/secfilingsdetails.

137.    JBS S.A.'s earnings presentation for the first quarter of 2015 noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit. *See* JBS S.A., 1Q 2015 Results (May 13, 2015) at 15, https://mzfilemanager.s3.amazonaws.com/_earnings_release.pdf. (JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations). Presentation also noted a 1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses. JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the Relevant Period was 80% fed, 20% non-fed.).

138.    Expanding on their cuts, Tyson Fresh, Swift/Packerland, CMS, and National Beef extended their joint slaughter reduction during the second quarter and into the third quarter of 2015. Across the second quarter, Tyson Fresh's, Swift/Packerland's, and National Beef's year-on-year

slaughter decreased by approximately 5.4%, 12.8%, and 6.2%, respectively. CMS continued to hold to its low 2014 slaughter volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

139.     This reduction in cattle processing was also reflected in Tyson Foods', JBS S.A.'s, and Jefferies' (National Beef's) financial reporting for the second quarter of 2015. *See, e.g.,* Tyson Foods Form 10-Q, filed August 2, 2015, at 38; Tyson Foods Form 10-K, filed November 23, 2015, at 29 (noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing); JBS S.A., 2Q 2015 Results (August 13, 2015) at 15, https://mzfilemanager.s3.amazonaws.com/ 043a77e1-0127-4502-bc5b-21427b991b22/central-deresultadoscentral-dedownloads/        earnings_release.pdf (noting 0.9% decline in cattle processing (both fed and non- fed) across its US, Australian and Canadian beef businesses); Jefferies Form 10-Q, filed August 5, 2015 at 52 (noting revenues for three and six month 2015 periods decreased year-on-year "primarily due to lower sales volume, as fewer cattle were processed."); Jefferies Form 10-Q, filed November 5, 2015, at 53 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

140.     During the remainder of 2015, Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up." *See* Cassandra Fish, *Kills Too Small for Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/ kills-too-small-for-too-long/.

## VI.     Defendants Continued to Artificially Limit Supply During 2016.

141.     By "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks, which was against Defendants' independent economic self interest, Defendants in early January 2016 dampened rising cattle prices and extended the rally in beef prices. Cassandra Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/. Defendants then further inflated beef prices by sustaining low kills across February and

March. Cassandra Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com /2016/ 01/06/yet-more-consolidation/.

142.     Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-0.7%), CMS (-3.3%), Swift/Packerland (-16.3%), and National Beef (-4.4%). Defendants also slaughtered fewer cattle than their average first quarter volume compared to 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (- 21.7%), CMS (-9.3%), and National Beef (-14.9%).

143.     As a result, beef prices continued to skyrocket into March 2016 despite significantly lower than expected cattle prices. Defendants posted average weekly margins of approximately $63 per head, which, at that time, was one of their "best Q1 in history" and well above their recent pre-conspiracy first quarter average of $0 per head. Cassandra Fish, *This Week's Cash Trade*, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.

144.     In the second and third quarters of 2016, each Defendant's kill volume remained below their 2012-2014 averages.

145.     Despite an increase in the availability of fed cattle, except for Cargill, each Defendant's annual slaughter volume in 2016 remained below their 2014 levels (Tyson Fresh

146.     (-6%) and Swift/Packerland (-6%)) or flat (National Beef). *See* 2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE (2019) at 11. Cargill's 2016 slaughter remained 3.7% below its 2012-2014 average.

147.     In the third and fourth quarters of 2016, Defendants realized average per head margins on their fed cattle purchases and sales of $123 and $153 per head, respectively. Not only were these margins significantly above the recent pre-conspiracy averages for those quarters ($25 and $16 per head, respectively), they also exceeded the Defendants' most profitable third and fourth quarters in

modern times by about $30 and $100 per head, respectively. Given these conditions, it was against Defendants' respective unilateral self interests not to buy and slaughter more cattle.

**VII.    After Historic Cuts, Defendants Continued to Restrain Processing, Resulting in Higher Beef Prices in 2017 and 2018.**

148.    During 2017, Defendants colluded to ensure that any increase in their collective slaughter volumes did not outpace the growth in cattle availability and beef demand and restore competitive pricing. Tyson, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in lockstep during the first quarter of 2017, before raising them together during the second quarter. And while cattle prices increased from $119/cwt at the beginning of February 2017 to a high of $144/cwt in first week of May 2017 (like pre-conspiracy spring highs), Defendants responded by reducing their processing.

149.    As in 2016, Defendants enjoyed substantial profits across 2017 consistent with anti-competitive collusion, posting then record per-head margins in the second and third quarters ($128 and $147 per head, respectively). Indeed, their average per head margins for the first and fourth quarters, $42 and $88 per head respectively, stood second only to the profits for those quarters which they generated in 2016. And again, each Defendant failed to increase production to expand their market share, despite the apparent profit potential. Instead, they chose to maximize their profits by conspiring to keep their production in lockstep with one another, coordinating their purchasing to ensure the continued suppression of cattle prices and a corresponding increase in beef prices.

150.    Defendants' anti-competitive scheme continued into 2018. Each Defendant told the market that as a result of plant closures, they had insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the spring and summer of 2018. Cassandra Fish, *Still Green!?!,* THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception

is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

151.     Defendants then backed off their respective slaughter schedules during the first quarter of 2018. Cassandra Fish, The Beef (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/ futures-trade-both-sides-cash-poisedto-trade-lower/. As Ms. Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations . . . . Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable." *Id.* The slaughter reduction occurred despite record strong beef demand in the downstream market, and Defendants' under-utilized slaughter capacity.

152.     As a result of their commitment to coordinate the available cattle amongst themselves, across 2017 and 2018, Tyson Fresh's, Swift/Packerland's, CMS,' and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their recent pre-conspiracy averages respectively. By contrast, independent packers' slaughter volumes across 2017 and 2018 increased 46.5% and 56.1% respectively on their collective pre- conspiracy averages.

## VIII.   In 2019 and 2020, Defendants Continued Parallel Slaughter, Which Was Against Their Independent Self-Interest.

153.     Going into 2019, beef demand remained "terrific," which in a competitive market would encourage packers to run plants to meet customers' demand. Cassandra Fish*, How About That*, THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February."). Absent a conspiracy, Defendants' unilateral self interest given these conditions would have led them to compete to secure as much cattle as possible to supply beef customers.

154.    Instead, Defendants continued to work together to constrain and limit the increase in cattle prices that market conditions would have caused in a competitive market. In the first quarter of 2019, each Defendant reduced its slaughter volume, posting similar quarter-on-quarter declines: Tyson Fresh (-2.4%), National Beef (-4.0%), CMS (-6.6%), and Swift/Packerland (-7.4%). Defendants maintained collusively-low slaughter volumes across the first three months of 2019. These supply restraints included taking downtime or reducing plant operation hours. Defendants continued to constrain their weekly slaughter volumes and declined to increase production to meet rising demand in their downstream markets, thereby artificially inflating the price of beef. *See, e.g.*, Cassandra Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.

155.    The resulting impact of Defendants' collusive slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy was an increase in downstream beef prices, despite the fact that prices for cattle continued to decline to an apparent bottom of about $109-110/cwt in the end of June. This left cattle producers facing an average $106 per head loss, against Defendants' estimated per head profit of $257. *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING, INC. (June 26, 2019), https://www.drovers.com/news/industry/ profit-tracker-feeding- losses-reach triple-digits.

156.    Because of robust beef demand, Defendants' restrained production resulted in higher beef prices on a year-on-year basis, despite the fact fed cattle prices had declined. Ms. Fish reported beef prices were "sizzling" despite most cattle producers losing money. Cassandra Fish, *Packers Press and Cash Softens*, THE BEEF (August 9, 2019), https://www.thebeefread.com /2019/08/09/packers-press-and-cash-softens/.

157.    A slight $2-3/cwt rise in prices allowed cattle producers to realize only a small per head profit of about $24 by the week ending August 9, 2020, against the Defendants' profit of $192 per head.

158.    Notwithstanding the predicted cash cattle strength across August, a chance fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019, provided an opportunity for Defendants to conspire to cause cattle prices to trend even lower, sending cattle producers back into the red. Tyson closed the Holcomb plant indefinitely after the fire. *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019, 1:30 PM), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson -foods- beef-plant-in-kansas-out-of-work-after-fire.

159.    However, following the Holcomb plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef collusively slashed their fed cattle bids and increased their beef prices. These actions caused a $5/cwt decrease in fed cattle prices and a $14/cwt rise in wholesale beef prices the following trading week. *See Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING, INC. (August 20, 2019), https://cdn.farmjournal.com/. Live cattle future's contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

160.    This saw Defendants' per head margins rise from $191 to $358 in the week ending August 16. The following week, Defendants' margins continued to expand, with the spread between fed cattle prices and beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018, which had already been raised to anti-competitive levels as alleged above.

161.    Defendants blamed the loss of the Holcomb plant's 5,500-6,000 head per day slaughter capacity for these price changes. But in a competitive market, and with record profit margins, each individual Defendant would want to increase its purchases of cattle and increase its slaughter numbers to take advantage of the high prices and take market share from the industry leader Tyson.

162.    Instead, in the month following the Holcomb plant fire, each Defendant *decreased* its production. This parallel and coordinated decrease in production in response to a production issue at only one company cannot be explained by legitimate reasons, but instead demonstrates Defendants' conscious commitment to their conspiracy to maintain high margins by keeping their individual cattle slaughter restricted. Their purchase and kill reductions in the aftermath of the Holcomb plant fire ensured Defendants' collective supply remained constrained, giving them the power to increase beef prices while paying less for cattle.

163.    Tyson Fresh, Swift/Packerland, CMS, and National Beef consequently reaped record high margins in the weeks that followed the Holcomb plant fire by collusively causing a decrease in fed cattle prices and increasing beef prices. As cattle prices bottomed out in the week ending September 13, 2019, the spread between Defendants' and cattle ranchers' per head margins exceeded $600, with packers making over $400 per head while producers sustained $200 per head losses. *Sterling Beef Profit Tracker: week ending September 13, 2019,* STERLING MARKETING, INC. (September 18, 2019), https://cdn.farmjournal.com/s3fspublic/ inlinefiles/Beef%20Tracker%2081919.pdf.   This massive discrepancy was possible only because of the Defendants' illegal agreement to constrain slaughter levels.

## IX.    Defendants Idled and Closed Plants and Refrained from Expanding Processing Capacity.

164.    Defendants' conspiracy also entailed a strategy to restrict beef supplies through an agreement to permanently close processing facilities without replacing most of the lost capacity.

165.    In support of their conspiracy to reduce beef supply and increase beef prices, and despite rising demand and rising profit margins which in a competitive market would have led to Defendants unilaterally increasing production, Defendants instead collusively shrank the beef industry's processing capacity, to wit:

- On September 11, 2015, Cargill Inc. announced it would sell its Plainview, Texas plant that it idled in February 2013.

- In August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

By idling these plants, Defendants slashed the industry's annual slaughter capacity by some two million cattle per year.

166.    While overall industry slaughter capacity increased slightly between 2015 and 2018, this nominal gain was primarily not due to any Defendant. Instead, it was attributable to other beef-processing companies. For example, One World Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2014.  In a competitive market free from collusion, it would have been against Defendants' individual interests to cede capacity to these other companies in light of increased demand for beef.

167.    In sharp contrast to Defendants' behavior, other beef processing companies acted consistently with their competitive interests by increasing their capacity and output in response to increased demand for beef. But their increased efforts to supply the downstream market with beef had little effect on the prices due to their nominal market share. Defendants' market dominance meant that any minor incursions by the few remaining independent processors increased availability only in isolated pockets, but had negligible effect on beef prices in most locations.

**X.     Parallel Reductions in Cash Cattle Purchases and the Anticompetitive Queuing Convention.**

168.     Defendants procure their fed cattle in three ways: on the cash cattle trade market (the industry's version of the spot market), through formula or forward contracts, and, for Swift/Packerland and CMS, relying on their own cattle. Through these contracts, cattle producers agree to deliver their cattle once they have reached slaughter weight at a price to be determined at the time of delivery.

169.     To increase their beef  margins, Defendants jointly managed their purchases of domestic fed cash cattle in parallel below the available supply, including by reducing the number and volume of purchases. Defendants took advantage of the supply glut of fed cattle and lower cash cattle prices and increased their beef margins. They expanded their beef  margins by refusing to pass-on the savings from the reduced cattle prices to beef purchasers—including Quirch Foods—which would normally happen in a competitive market. Instead, beef prices remained high while prices paid to cattle producers decreased, indicating a collusive agreement among Defendants.

170.     In addition to Defendants' reduced cash cattle purchases, each employed an antiquated "queuing convention," which served to limit cattle producers' ability to generate price competition for their cattle.

171.     The queuing convention, which operated predominately in relation to those cattle sold in the cash market, works as follows: once a producer receives a bid from a packer, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers. And if another packer offers the same bid as the original bidding packer, the cattle producer must give the original packer the right of first refusal.

172.     The obligation to give a right of first refusal was collectively imposed by Defendants under threat of boycott.

173. One former feedlot manager, referred to as "Witness 2," confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to the queuing convention under threat of retaliation. Each of these field buyers individually told Witness 2 about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

174. Witness 2 also heard from the Defendants' field buyers and other industry participants about other cattle producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood the Defendant that was "on the cattle" would be tipped off regarding the cattle producer's "breach" of the convention by the field buyer contacted by the cattle producer while shopping the Defendant's bid, or would pressure the producer for details of its sale.

175. As evidenced by their expanding beef margins, Defendants collectively conspired not to pass on any savings from their anticompetitive conduct with respect to the cattle producers to purchasers such as Plaintiffs, instead doubling-down on keeping the ill-gotten gains for themselves. This manipulation of the cash market affected prices in the entire market for purchases of fed cattle and the consequent deflation of fed cattle prices.

## ADDITIONAL PLUS FACTORS EVIDENCE THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

176. The beef meatpacking industry bears all the characteristics of a highly cartelized market: (1) producer concentration, (2) high barriers to entry, (3) commodity product, (4) inelastic demand, (5) opportunities to collude, (6) reduction of imports, (7) market share stability, and (8) production and capacity cuts in the face of increasing beef demand. These characteristics supported Defendants' collusion to constrain the number of cattle slaughtered, which reduced and restrained the

volume of processed beef sold, and raised and fixed the wholesale price of beef, maximizing the Defendants' profit margins.

## XI. The Beef Market Is Highly Concentrated.

177. Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market, such as Defendants' control of the beef market. Practicalities, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players.

178. A high degree of control by a relatively small number of conspirators simplifies coordination because little outside competitive presence exists to undermine the cartel, and they can more easily monitor each others' actions related to supply and pricing.

179. In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that beef producers might achieved by undercutting the cartel price.

180. At all relevant times, Defendants collectively controlled about 81%–85% of the cattle slaughter market, while the next largest meatpacker had only a 2%–3% market share. Defendants' control of the market enabled the conspiracy to launch in 2015 and prosper.

## XII. The U.S. Beef Market Has High Barriers to Entry.

181. Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market, making it easier for incumbents to collude.

182. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits reaped from supra-competitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Barriers to entry, therefore, help facilitate the formation and maintenance of a cartel.

183.    Barriers to entry kept prospective competitors out of the beef packing industry. The construction of a large packing plant requires an investment of at least $250 million and normally takes two years or longer to obtain the necessary permits and plan, design, and build the facility. New market entrants also must comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

184.    These barriers have caused new entrants to file for bankruptcy shortly after attempting to enter the beef market, including substantial enterprises, such as Northern Beef Packers, LP, and Sam Kane Beef Processing, LLC. Northern Beef Packers LP filed Chapter 11 in July 2013, ceasing operations before selling its assets in December 2013. *See* "Northern Beef Packers sold to White Oak for $44.3 million," *The National Provisioner* (Dec. 9, 2013). Sam Kane Beef Processing filed Chapter 11 in January 2019 and was acquired by STX Beef Co. in February 2019. *See* "Kane Beef plant sale closes, new owner pledges to restart operations*," Daily Adviser* (Mar. 1, 2019).  Relative insulation from the threat of new competitors has thus enabled Defendants to maintain their conspiracy.

## XIII.   Beef is a Commodity Product.

185.    A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

186.    Beef is a commodity. For example, Tyson and Cargill beef roasts are virtually indistinguishable with nearly identical nutritional content. The USDA recognizes beef as a commodity and posts daily beef prices. Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

187.    Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes, such as

product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

188. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot be readily attributed to other factors, such as special product features, quality, reliability and durability, or other terms of a transaction.

## XIV. The Demand for Beef is Inelastic.

189. Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service. Demand is inelastic if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product.

190. Under inelastic demand conditions, customers have nowhere to turn for an alternative, cheaper product of similar quality, and continue to purchase despite a price increase.

191. Inelastic demand is a market characteristic facilitating collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

192. Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, "since beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume purchased." *See* Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants* (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-BeefDemand-Determinants FullReport.pdf.

193. The same study concluded that the relative impact of other meat prices on beef demand is economically small. Defendants' supra-competitive beef prices to their customers therefore did not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

**XV.    Defendants Took Advantage of Multiple Opportunities to Collude.**

194.    Defendants are members of industry trade associations and forums and regularly attend industry events, including the events discussed below. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

195.    For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon, which includes a summer conference, legislative conference, and regional meetings. *See, e.g.*, *NCBA Allied Industry Membership*, NATIONAL CATTLEMEN'S BEEF ASSOCIATION (2019), https://convention.ncba.org/. The NCBA Product Council, which includes Defendants' representatives and representatives from other packers, meets quarterly for the invitation-only Beef Executive Forum. Two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement, Bill Thoni, and former Tyson Senior Vice President of Beef Margin Management and Vice President of Boxed Beef Pricing, Kevin Hueser, were officers, board members, or designated participants of the NCBA during the Relevant Period. Defendants also participated in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

196.    The U.S. Meat Export Federation ("USMEF") is another example of a trade association where Defendants regularly met. The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade shows. *See Events: Meetings*, U.S. MEAT EXPORT FEDERATION (2019), http://www.usmef.org/ events/bodmeetings/; *Events: Trade Show Calendar,* U.S. MEAT EXPORT FEDERATION (2019), http://www. usmef.org/events/trade-shows/.

197.    USMEF leadership includes Defendants' current and former officers and employees. For example, former CMS/Cargill Vice President of International Sales, Pat Binger, was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods Senior Vice

President of International Sales, Roel Andriessen, served as the Chair, Vice Chair, and on the Executive

Committee of the USMEF; former Tyson Foods Senior Vice President of International Sales and Vice

President of International Sales, Robert Shuey, was a formal participant of the USMEF; National Beef

International President and former Vice President of International Sales, Peter Michalski, served on

the Export Committee of the USMEF; and former National Beef NBP International Sales President,

Mark Domanski, served on the Export Committee of the USMEF. In November 2017, Tyson's Roel

Andriessen and CMS's Pat Binger attended the USMEF Strategic Planning Conference in Tucson,

Arizona. *See USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT

EXPORT FEDERATION (Nov. 3, 2017), https://www.usmef.org /news-statistics/member-news- archive/

usmefmembers-examine-challenges-ahead-elect-new-officer-team/.

198.    Defendants also were among the founding members of the Global and U.S.

Roundtables for Sustainable Beef and continue to be members. Defendants participate in its annual

meetings each spring; Defendants Cargill and JBS have leadership positions in some of the working

groups.

199.    Defendants also meet at  conferences, conventions, and expositions sponsored by the

North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute. NAMI is

a national trade association representing companies that process 95% of the red meat in the U.S.

market. *See About NAMI,* NORTH AMERICAN MEAT INSTITUTE (2019), https://www.meatinstitute.org

/index.php?ht=d/sp/i/204/pid/204; Events, NORTH AMERICAN MEAT INSTITUTE (2019),

https://www.meatinstitute.org/index.php?ht=d/sp/i/ 10422/pid/10422. Defendants' executives and

employees also participated and held leadership positions in the NAMI. For example, CMS President

of Business Operations & Supply Chain and former Cargill Beef President, John Keating, was an

officer, board member, or formally designated participant of NAMI; former Tyson Foods CEO, Group

President of Fresh Meats & International, and COO, Noel White, served on the NAMI Executive Committee; former Tyson Foods CEO and President, Thomas Hayes, also served on the NAMI Executive Committee; National Beef President and CEO, Timothy M. Klein, served on the Executive Committee of NAMI; and JBS USA CEO, Andre Nogueira, served on the NAMI Board of Directors.

200.    NAMI and the Food Industry Association host an annual Meat Conference, which various executives and employees of Defendants attend every year. In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing, Don Kieffer, JBS USA's Andre Nogueira, and CMS Vice President of Sales, John Jay, amongst other Defendant executives, attended the Meat Conference. See *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUSTRY ASSOCIATION (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRoster Public/viewRoster?meetingId.

201.    In 2018, National Beef's Timothy Klein, JBS USA's Andre Nogueira, Cargill Vice President of Retail Beef Business, Elizabeth Gutschenritter, and Tyson's Don Kieffer were listed as attendees at the NAMI  Conference. *See 2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT    CONFERENCE    (Feb.    9,    2018),    http://meatconference.com/sites/default/ files/books/2018%20AMC%20Attendee%20List. pdf.

202.    In 2019, JBS USA's Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees. *See Meat Conference 2019 Attendee List (as of 2/27)*, MEAT    CONFERENCE    (Feb.    27,    2019),    http:// meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

203.    In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees. *See 2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId.

204.    Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics, such as economics and general business. That conference was then replaced by an annual Meat Industry Summit, which has since sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing, entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

205.    The beef industry's Annual Meat Conference described the event as "a complete education and networking experience," and provided another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS, Tyson Foods's then-CEO Donnie Smith, and twelve other Tyson executives.

206.    In 2018, Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk Management Education and Research at Kansas State University. *See Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIVERSITY (Mar. 8, 2018), https://www.ksre.kstate.edu/news/stories/2018/03/AgCon2018.html). CMS' Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other of Defendants' executives and employees, including Tyson Fresh's Vice President of Sourcing & Risk Management, Randall Chambers, Tyson Fresh's Vice President of Cattle Procurement, John Gerber, National Beef Vice President of Cattle Procurement, Chad Barker, National Beef Vice President of Procurement and Risk

Management, Phil Groetken, and JBS USA Head of Risk Management, Marco Sampaio. *See 2018 AgCon Attendees*, KANSAS STATE UNIVERSITY (Mar. 28, 2018), https://www.kstate.edu/riskmanagement/documents/Ag_Con_2018_ Attendees_ Mar30. pdf.

207. Tyson, JBS, and Cargill executives also had ample opportunities to meet privately, particularly at the beginning of the conspiracy, due to JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29, 2015, respectively (*see* JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/ data/1691004/000119312516785274/d304020df1.htm), while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015. Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle, such as then-Tyson CEO and President, Donnie Smith, JBS USA CEO, Andre Nogueira, and then-Cargill Senior Vice President, Todd Hall, were all involved in the acquisition discussions. JBS S.A.'s CEO Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago," with discussions intensifying at the beginning of 2015—which coincided with the start of the Relevant Period. *See* Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-porkproducer-in-u-s-1435864508.

208. These events afford Defendants' top executives and other employees with frequent opportunities to discuss beef pricing, production, and other proprietary information in an informal setting, as well as monitor compliance with their conspiracy.

**XVI.  Defendants Exacerbated Their Supply Restraints by Reducing Imports.**

209.  Defendants did not offset their slaughter reductions by importing more cattle into the U.S., and instead reduced imports despite the domestic beef shortage that their conspiracy caused.

210.  Certain Defendants also shuttered international plants, thereby decreasing the supply of cattle available for import to the United States, which could otherwise have offset Defendants' conspiratorial reductions.

211.  Defendants' reduced domestic slaughtering and cattle imports for slaughter combined to raise beef prices paid by Plaintiffs above competitive levels.

**XVII.  Defendants' Market Share Stability is Indicative of a Conspiracy.**

212.  In a competitive market, market shares fluctuate as beef producers compete for and gain business from each other. Stable market shares over time can suggest anticompetitive behavior, like that engaged in by Defendants.

213.  Market-share stability in a commodity market strongly suggests operation of an effective cartel that has agreed not to compete. A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

214.  Defendants' market shares, measured by wholesale beef sales, became more stable once their conspiracy started. The same is true for Defendants' market shares as measured by slaughter capacity.

215.  Defendants did not take actions that true competitors would do in a competitive market. They did not attempt to capture each other's market share or lower prices as their costs declined.

216.  As described above, Defendants instead collusively reduced their output and capacity to produce beef for sale to purchasers such as Plaintiffs. In a competitive market, the reduction in output by one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

51

217.    But instead, Defendants jointly reduced their output in order to limit beef supply, which increased beef prices. By acting together to advance their conspiracy, Defendants sacrificed potential individual gains via increased market share for larger collective gains for all by increased prices and profit—all at the expense of purchasers such as Plaintiffs.

## XVIII. Defendants Implemented Production Cuts Despite Surging Beef Demand.

218.    Defendants' joint slaughter management was not a reaction to changes in beef demand.

219.    Beef demand remained strong after the Defendants' conspiracy began, and, in fact, steadily increased. But Defendants did not react to this increased demand as they would in a competitive market, by competing for increased share. Instead they colluded to keep beef supply artificially low, and their profit margins artificially high.

## THE BEEF INDUSTRY FACES GOVERNMENT INQUIRIES AND INVESTIGATIONS

220.    In August 2019, the USDA opened an investigation into the beef industry following the fire at Tyson's Holcomb, Kansas plant. The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while beef prices increased.

221.    On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging it to launch an investigation into price-fixing in the cattle market. The authors highlighted Defendants' harm to upstream producers and downstream consumers.

222.    On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anti-competitive marketplace that unfairly disadvantages the cattle producer and the consumer." Senator Rounds further commented, "These margins just don't make any sense. The reality is there is an inverse correlation between the producer's price and the consumer's price."

223. On April 8, 2020, Reuters reported that the USDA had extended its existing investigation to include a pricing dynamic like what was observed after the Holcomb plant fire—reduced prices paid to ranchers for cattle accompanied by a surge in retail beef prices—following announced production shortages associated with the nationwide COVID-19 outbreak.

224. On April 17, 2020, state level cattle production trade associations from 23 states signed a letter to Attorney General William Barr, requesting the DOJ to coordinate with the USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association.

225. The letter described two extraordinary pricing episodes, identified by the USDA, following the Holcomb plant fire and during the COVID-19 outbreak. The state trade associations not only reported their own plight but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

226. With respect to the most recent alleged market manipulations, the letter further explained:

> We are now seeing that same type of price action [observed after the Holcomb fire] repeated— only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system. Indeed, in the last analysis, Defendants' conduct portends more than mere profiteering. If left unchecked, it will remain a direct and gathering threat to the country's food security during the current crisis.

*Id.*

227. On May 5, 2020, eleven state attorneys general, including the Minnesota attorney general, signed a joint letter to Attorney General Barr, urging the DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry." This

letter noted that : "Cattle ranchers . . . often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

228.    On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, Inc., and National Beef in connection with an investigation into antitrust violations consistent with the requests made by the producer trade associations and state attorneys general.

## ANTITRUST INJURY

229.    The cattle market is an oligopsony consisting of Defendants, who both purchase most of the cattle for slaughter, and produce most of the beef sold in the wholesale market to purchasers such as Plaintiffs. When Defendants colluded to restrict supply, their oligopsony left Plaintiffs with no choice but to accept whatever beef prices Defendants offered.

230.    When the beef market is functioning competitively, a strong relationship exists between the cattle supply and beef prices paid by purchasers such as Plaintiffs.

231.    Thus, in a competitive market, lower wholesale beef prices naturally follow lower cattle prices. Once the conspiracy took hold, however, the spread between cattle and beef prices grew significantly. Defendants' reduced purchases of cattle caused cattle prices to slump, while Defendants charged purchasers of beef such as Plaintiffs elevated prices that would not have existed in the market but for the artificial supply restraints.

232.    According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to 2020 than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase. The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the recent pre-conspiracy average.

233.     Defendants' ability to decrease beef production while maintaining inflated beef prices provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their purchases and sales and increase their market shares. That did not happen here as to Defendants due to their conspiracy.

234.     In this manner, Defendants' oligopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price, while not decreasing the prices they charged for beef.

235.     Further, because imported beef was not offsetting the shortages that Defendants created, the restricted supply of cattle caused a restricted supply of beef in the downstream market to purchasers like Plaintiffs.

236.     Because no other source of beef could meaningfully offset the collusive shortages, Defendants were able to restrict the supply of beef in the downstream market to purchasers such as Plaintiffs.

237.     Because Defendants had and have accompanying downstream market power, they were able to maximize their profits by colluding to produce volumes based on their marginal revenue curve, instead of the market demand curve. Defendants' conspiracy thereby artificially increased the beef prices paid by Plaintiffs, as well as other beef purchasers, which provided the source for the Defendants' anti-competitive profits.

238.     Because Defendants did not fear competition from other meatpackers, Defendants' oligopsony power and anticompetitive conduct had the following effects, among others:

- Price competition in the beef market was restrained or eliminated;
- Prices for beef sold by Defendants, their divisions, subsidiaries, affiliates, and co-conspirators were raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;

55

- Wholesale purchasers of beef, including Plaintiffs, were deprived of free and open competition; and

- Wholesale purchasers of beef, including Plaintiffs, paid artificially inflated beef prices.

239. The purpose of Defendants' and their co-conspirators' illegal conduct was to raise, fix, and maintain the price of beef above a competitive level. As a direct and foreseeable result, Plaintiffs paid supra-competitive prices for beef, from the beginning of the conspiracy and through the end of its effects, including through at least the end of 2021. Defendants' violations of the Sherman Act therefore caused Plaintiffs to suffer injury to its businesses or property, of the type the antitrust laws were designed to punish and prevent.

## **DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY**

### I. **Defendants Concealed Their Conspiracy from Plaintiffs.**

240. Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiffs through at least the filing of the first related complaint.

241. Defendants used various means and methods to fraudulently conceal their conspiracy from Plaintiffs' meat buyers, including, but not limited to, secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, and statements to Plaintiffs designed to deceive Plaintiffs about the real factors involved in the prices that Plaintiffs paid for beef.

242. As set forth above, Defendants engaged in secret behavior intended to advance their conspiracy. Defendants' conspiracy—based on behavior known only by them to be illegal at the time they engaged in such behavior—plausibly suggest Defendants engaged in a campaign of fraudulent concealment.

243. Defendants concealed their illegal behavior from Plaintiffs by, *inter alia*:

- Communicating privately by telephone about their purchases and slaughter volumes, so they would not create written evidence of sharing this information, as well as relying on nonpublic forms of communication;

- Offering false or pretextual rationales for the low fed cattle prices;

- Providing pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;

- Explicitly and implicitly representing that the fed cattle bids and contract terms offered to Plaintiffs were the product of honest competition and not a conspiracy;

- Misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and

- Misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and the public.

244. Defendants also intentional decieved Plaintiffs about their compliance with antitrust laws, including in the public statements available to Plaintiffs as beef purchasers who were otherwise uninvolved in Defendants' relevant activities.

245. Regarding Cargill, Inc.'s, JBS S.A.'s, and Tyson Foods's false or pretextual statements or issued false or pretextual data, Cargill, Inc. did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh because had Defendants not continually cloaked their conspiracy, the conspiracy would have been unable to operate.

246. In addition to Defendants having affirmatively concealed their conspiracy, it was inherently self-concealing because it depended on secrecy for its successful operation.

247. Defendants also intentionally deceived beef purchasers, including Plaintiffs, about the real reasons for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade.

248. Defendants knew that their statements about the causes of higher beef prices and higher profits from beef sales to purchasers such as Plaintiffs were false and deceptive, because they concealed the role the Defendants' conspiracy played in beef pricing and sales profitability. Defendants intentionally made these false statements in order to mislead purchasers such as Plaintiffs into believing

that they were paying competitive prices for beef, and because they knew that keeping Plaintiffs in the dark about their conspiracy would help allow the Defendants to operate the conspiracy without legal challenge, and continue to profit from it.

249. Until at least the filing of the first related complaint, Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief as stated in this complaint. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the filing of the cattle ranchers' class action, *In re Cattle Antitrust Litigation*, in this District on May 7, 2019. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix beef prices. When Plaintiffs exercised reasonable diligence as a beef purchaser to inquire about beef prices, Defendants intentionally provided them with false and deceptive information, which Plaintiffs could not have known was false. Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

## DEFENDANTS ENGAGED IN CONTINUING VIOLATIONS

250. A continuing violation can operate in two ways. First, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. Second, a continuing violation can occur where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiffs.

## I. Defendants Renewed their Conspiracy with New and Independent Acts.

251. From the start of their conspiracy, at least as early as the beginning of 2015, and continuing through the effects of the conspiracy, Defendants or their co-conspirators sold beef to purchasers such as Plaintiffs at artificially raised and fixed prices resulting from Defendants' continually renewed and adjusted supply- and price-fixing agreements. Defendants, acting

collectively, had to continually renew and adjust their illegal agreements to account for ever-fluctuating economic and market conditions.

252.     Defendants' conspiratorial meetings and misrepresentations to beef purchasers such as Plaintiffs were among the overt acts that commenced running a new statute of limitations, because such meetings and misrepresentations advanced the objectives of their conspiracy. Defendants also committed new overt acts each time they took actions to implement their conspiracy, such as reducing and restraining the supply of processed beef and their actions regarding the purchase of fed cattle, which occurred at each auction, and their decisions to curtail production at their processing plants.

253.     Each sale of beef by a Defendant at a supra-competitive price also was a new overt act and an antitrust and PSA violation that injured beef purchasers, including Plaintiffs, and started the statutory period running again.

254.     Defendants' overt acts, including, but not limited to, those mentioned above, were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury and damages on Quirch Foods.

## II.     Defendants Inflicted New and Accumulating Injury on Plaintiffs.

255.     Plaintiffs purchased beef directly from Defendants and their co-conspirators from the beginning of the conspiracy until the present, and will continue to do so in the future.

256.     Each direct beef purchase by Plaintiffs from Defendants and their co-conspirators at a price which was higher, or will be higher, as a result of Defendants' continually renewed and adjusted illegal agreements necessarily caused Plaintiffs to suffer new and accumulating injury, harm, and damages.

257.     As the concept of a continuing violation applies to a conspiracy that brings about a series of unlawfully high-priced sales over several years, each direct sale of beef to Plaintiffs by Defendants or their co-conspirators starts the statutory period running again, regardless of when Plaintiffs became aware of the conspiracy. This means that each illegally priced direct sale of beef to Plaintiffs by Defendants or their co-conspirators created a new cause of action for purposes of the statute of limitations.

258.     Defendants' conspiracy continued into the period four years before the first cattle ranchers class action complaint was filed, and also into the period four years before the filing of the first direct purchaser class action complaint.

259.     Defendants constantly coordinated and communicated with each other beginning in 2015 and through the present. Including in this manner, Defendants' conspiracy continued when their direct beef sales to Quirch Foods/Topco were made during the period four years preceding the filing of the first related cattle ranchers class action complaint, and during the period four years preceding the filing of the first direct purchaser class complaint.

260.     Each of the above-referenced beef industry plus factors were present in 2015 and through the present: high market concentration, commodity product, inelastic demand, high barriers to entry, and trade association meetings that occurred each year and provided Defendants with multiple opportunities to conspire.

261.     Defendants' unlawful beef  conspiracy was intended to and did inflict continuing injury, harm, and damages on Plaintiffs' businesses and property.

## CLAIMS AND CAUSES OF ACTION

### COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (AGAINST ALL DEFENDANTS)

262.     The preceding factual statements and allegations are incorporated by reference.

263. Beginning at least as early as 2015 and continuing through as long as the effects of the conspiracy lasted, the exact dates presently unknown to Plaintiffs but continuing at least until the end of 2021, Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, and stabilize the wholesale price for beef in the United States, thus creating anticompetitive effects in violation of Section 1 of the Sherman Act.

264. As set forth above, Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or carried out by their officers, agents, employees, or representatives while actively engaged in the operation and management of Defendants' affairs.

265. As further set forth above, Defendants and their co-conspirators conspired to conceive and further their objects of the conspiracy, including, without limitation, by colluding to reduce the supply of beef sold to purchasers such as Plaintiffs and thereby raising and maintaining the prices for such beef above what it would have been absent the Defendants' illegal agreements.

266. Defendants' unlawful combination and conspiracy had the following effects, among others:

- Price competition in the sale of beef in the United States was restrained, suppressed, and eliminated;

- Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators, were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Persons and entities that directly purchased beef from Defendants, their divisions, subsidiaries, affiliates, and co-conspirators, including Plaintiffs, were deprived of the benefits of free and open competition in the purchase of beef.

267. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by artificially raising and fixing beef prices throughout the United States, because Defendants sell beef in every state. Their unlawful conspiratorial acts and combinations caused unreasonable restraints in the beef market.

268.     Plaintiffs have been injured, and may continue to be injured, in its businesses and property by paying more for beef purchased from Defendants and their co-conspirators than it would have paid and/or will pay absent Defendants' unlawful conspiracy.

269.     Defendants' unlawful contract, combination, understanding, agreement, and/or conspiracy is a *per se* violation of the federal antitrust laws, for which Plaintiffs are entitled to treble damages. Plaintiffs also are entitled to an injunction against Defendants to prevent and restrain further violations of the federal antitrust laws.

## COUNT II: VIOLATION OF THE PACKERS AND STOCKYARD ACT<br>(AGAINST ALL DEFENDANTS)

270.     The preceding factual statements and allegations are incorporated by reference.

271.     The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

272.     Each of the Defendants and co-conspirators is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

273.     Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a)     Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b)     Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c)     Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d)     Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e)     Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f)     Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g)     Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

274.    The PSA's enacting regulations contain further restrictions.  For example, the regulations limit packers' rights to share buying information with competitors.

No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

275.    The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

276. The competitively sensitive information that the Defendants and co-conspirators privately sent to or received from one another in support of their conspiracy, including information about their cattle purchases, was an "article" under the PSA.

277. Defendants and their co-conspirators sent or received this competitively sensitive information for the purpose and with the effect of manipulating the price of beef sold to Plaintiffs and others in the United States.

278. Defendants and their co-conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other to restrict beef production in the United States in order to increase, fix, stabilize, and/or maintain the price of beef sold to Plaintiffs and others in the United States.

279. The actions of each Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

280. Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation. Further, this section provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

281. The violations of 7 U.S.C. § 192 committed by the Defendants and their co-conspirators have illegally limited the supply of beef, manipulated the price of beef, injured Plaintiffs, and caused Plaintiffs damages by forcing them to pay inflated, supra-competitive prices for beef.

## **RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs respectfully request that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described conspiracy and the acts engaged in by Defendants and their co-conspirators in furtherance thereof

violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and the PSA, and further, judgment be entered

against Defendants awarding Quirch Foods:

(i)     Three times the damages sustained by Plaintiffs as a direct and/or proximate result of Defendants' violations of Section 1 of the Sherman Act, including attorneys' fees, litigation expenses, and court costs pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

(ii)    Damages to the maximum extent allowed under law in consequence of the violations of the PSA;

(iii)   Prejudgment and post-judgment interest at the highest legal rates;

(iv)    A permanent injunction against Defendants and their co-conspirators, subsidiaries, affiliates, successors, transferees, assignees, officers, directors, partners, agents employees, and all other persons acting or claiming to act on their behalf or in concert with them, enjoining them from (a) continuing, maintaining, or renewing the conduct, conspiracy, or combination that is the subject of this action, (b) entering into any other contract, conspiracy, or combination having a similar purpose or effect, and/or (c) adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the antitrust laws and PSA; and

(v)     Such other and further relief the Court deems just and proper under the circumstances.

## **JURY TRIAL DEMANDED**

Pursuant to FED. R. CIV. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated:                                    Respectfully submitted,

                                          /s/ Eric R. Lifvendahl
                                          **LIFVENDAHL LAW, LLC**
                                          Eric R. Lifvendahl
                                          265 Latrobe Avenue
                                          Northfield, IL 60093
                                          Tel: (847) 830-7002
                                          E-mail: eric@liflaw.com

                                          **STEARNS WEAVER MILLER WEISSLER**
                                          **ALHADEFF & SITTERSON, P.A.**
                                          Jay B. Shapiro (*pro hac vice* admission pending)
                                          Carlos J. Canino (*pro hac vice* admission pending)
                                          Sam O. Patmore (*pro hac vice* admission pending)
                                          150 West Flagler Street, Suite 2200
                                          Miami, Florida 33130
                                          Tel: (305) 789-3200
                                          Fax: (305) 789-3395
                                          Email: jshapiro@stearnsweaver.com
                                          Email: ccanino@stearnsweaver.com
                                          Email: spatmore@stearnsweaver.com

                                          **KAPLAN FOX & KILSHEIMER, LLP**
                                          Robert N. Kaplan
                                          Elana Katcher
                                          Matthew P. McCahill
                                          800 Third Avenue, 38th Floor
                                          New York, NY 10022
                                          Tel: (212) 687-1980
                                          E-mail: rkaplan@kaplanfox.com
                                          E-mail: mmccahill@kaplanfox.com

                                          **THE COFFMAN LAW FIRM**
                                          Richard L. Coffman
                                          3355 West Alabama, Suite 240
                                          Houston, TX 77098
                                          Tel: (713) 528-6700
                                          E-mail: rcoffman@coffmanlawfirm.com

                                          *Counsel for Plaintiffs*